COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judges Frank and Powell
Argued by teleconference


COMMONWEALTH OF VIRGINIA
                                              MEMORANDUM OPINION[*] BY
v.        Record No. 0416-09-3                JUDGE CLEO E. POWELL
                                                    AUGUST 4, 2009
JUSTIN MARCUS CALLOWAY


              FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
                            David A. Melesco, Judge

           Eugene Murphy, Senior Assistant Attorney General (William C.
           Mims, Attorney General, on briefs), for appellant.

           Jason S. Eisner (Office of the Public Defender, on brief), for
           appellee.


        Justin Marcus Calloway was indicted for possession of a firearm by a convicted felon.  The

trial judge granted Calloway's pre-trial motion to suppress the firearm, which was discovered

during a police officer's search of the white vehicle in which Calloway was a passenger, and his

statements made subsequent to his arrest.  The Commonwealth appeals, see Code § 19.2-398,

and argues that the police officer justifiably stopped the vehicle in which defendant was riding

when the officer, who was responding within seconds to a "shots-fired" call, saw the defendant

in a car that had just made a wide turn, like it was "going too fast to make the turn," coming from

the area where the call originated.  This officer knew that defendant had been involved in two

other gun-related incidents in the past month in the same city block.  For the reasons that follow,

we reverse the trial court's decision to suppress and remand the case for a trial on the merits.

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

"In an appeal by the Commonwealth of an order of the trial court suppressing evidence, the evidence must be viewed in the light most favorable to the defendant and findings of fact are entitled to a presumption of correctness unless they are plainly wrong or without evidence to support them." Commonwealth v. Peterson, 15 Va. App. 486, 487, 424 S.E.2d 722, 723 (1992) (citing Code § 8.01-680). Officer Clark Gagnon, of the Danville City Police Department, was dispatched to a call of "shots-fired" after dark on July 4, 2008. The call came from the 600 block of Worsham Street. The officer, who was in the area when the call came, approached Worsham Street from Kushner Street, an adjacent street. He saw a white vehicle being driven down Worsham Street make a wide right turn onto Kushner Street like it was "going too fast to make the turn." Though the officer was two hundred to two hundred fifty feet from the car, he saw some of the white vehicle cross the yellow line.[1] The officer thought his car would have been hit had it been there.

As the white vehicle approached the officer's car, the officer immediately recognized Calloway as the man in the front passenger seat. The officer testified that the street was lit and that was how he could see Calloway in the white vehicle.[2] Officer Gagnon knew Calloway with whom he had numerous dealings in the past, most of them involving firearms, and one of which had occurred approximately a month earlier in the same block from which the shots fired report originated that evening. During the previous incident, Calloway had been shot in the leg in an armed robbery and told police then that he would not be shot or robbed again. Then, about three weeks before the July 4th incident, Officer Gagnon responded to another "shots-fired" call in the 600 block of Worsham Street. On that occasion, Officer Gagnon saw Calloway and an unknown

---

[1] On cross-examination, Officer Gagnon stated that if the car had not crossed the yellow line, it was very close to doing so.

[2] Calloway's sister drove the white vehicle. His brother sat in the back seat.

man running down Worsham Street toward Kushner Street. The officer detained Calloway and later found a loaded firearm about fifty feet from where Calloway was.

On the night of July 4th, Officer Gagnon saw Calloway bending forward as the white vehicle passed his car. Officer Gagnon testified that he stopped the white vehicle because it was leaving the scene at "what I thought was a high rate of speed, made a wide right turn" and that he knew Calloway, whom he had seen bending down as the white vehicle passed his police car, "to possess or be around firearms throughout my career." After the officer stopped the white vehicle, he patted Calloway down and found no weapons. He obtained permission to search the vehicle from the driver, Calloway's sister. Officer Gagnon found a loaded pistol directly under the seat in which Calloway sat. The officer determined that Calloway was a convicted felon and arrested him. At the jail, Calloway told Officer Gagnon that he had borrowed the gun.

The trial court granted Calloway's motion to suppress. In so doing, the court found that Officer Gagnon is a very fair and honest police officer but determined that it could not say that the car made an illegal turn because the officer could not be certain that the car crossed the yellow line.

> [T]his police officer knew this defendant, knew his habits and his ability to get in trouble, I guess would be the mildest way to describe it, particularly with firearms and he did what I hope most well educated and thoughtful police officer[s] would do, he added one and one and easily came up with two and stopped him. The problem is, is what I think what appears at least to be good police work and a lot of life is hunches and he didn't . . . [sic] there was nothing out of the way or untowards [sic] in the officer's behavior towards this man when he stopped him. He just had a hunch and he played it and he played it because of his knowledge of this man.

The court concluded that based on the totality of the circumstances an officer could not objectively indicate a reasonable, articulable suspicion that criminal activity was afoot involving that car and Calloway at that time.[3]

In Davis v. Commonwealth, 35 Va. App. 533, 546 S.E.2d 252 (2001), an officer was dispatched to a fight in progress in a subdivision. 35 Va. App. at 536, 546 S.E.2d at 253. He did not receive a description of the suspect. Id. at 536, 546 S.E.2d at 254. While en route, the officer received a call that the suspect was running towards Pinewood Drive, but he again received no description of the suspect. Id. When the officer arrived on Pinewood Drive, he saw Davis rapidly back a vehicle out of a driveway. Id. The officer stopped Davis to determine whether he was involved in the fight. Id. Although the officer learned that Davis was not involved in the fight, the officer determined that Davis did not have a valid driver's license and warned Davis not to drive. Id. at 537, 546 S.E.2d at 254. Later that day, the officer again saw Davis driving, stopped him, and arrested him for driving on a suspended license. Id. On appeal,

---

[3] In granting Calloway's motion to suppress, the trial court relied on Moore v. Commonwealth, 276 Va. 747, 668 S.E.2d 150 (2008), and Jones v. Commonwealth, 53 Va. App. 171, 670 S.E.2d 31 (2008). Neither case, however, is controlling because, in both, the officers lacked information that a crime had been committed. In Moore, an officer noticed a car with an inspection sticker that was "peeling off the windshield[,]" followed the car, and checked the car's license plate. 276 Va. at 751, 668 S.E.2d at 152. The officer learned that the car belonged to a rental company, but stopped the driver anyway. Id. During the stop, he smelled marijuana coming from the car, searched the car, and found contraband. Id. The Court held that because guilty knowledge is an essential element of displaying a fictitious inspection sticker, the officer could have no more than a hunch that the driver of the *rental car* knew that the sticker was fictitious. Id. at 757-58, 668 S.E.2d at 156. Moore differs from the case before us because, in Moore, an essential element of the suspected crime, guilty knowledge, was clearly absent, as the officer knew the car was a rental car. In Jones, the officer saw a man in a "very high crime area" whose "demeanor changed completely" upon seeing the officers. 53 Va. App. at 175, 670 S.E.2d at 33. As the officers approached, Jones walked away briskly and "began to clutch his right side with his right hand." Id. The officer directed Jones to stop, but Jones disregarded the officer's command. Id. The officer then seized Jones, patted him down, found a .45 caliber pistol, and subsequently discovered that Jones had prior felony convictions. Id. We held that "Jones'[s] failure to obey the officer's instructions cannot serve as the justification for his seizure." Id. at 180, 670 S.E.2d at 35. In Jones, the officers had no information at all that a crime had been committed – just knowledge that the appellant was in a high crime area.

Davis argued that the first stop violated the Fourth Amendment and, as such, the second stop was illegal because it was the fruit of the first stop.  Id.

There, we held that

> "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.  On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response.  A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at that time."

Id. at 539-40, 546 S.E.2d at 255 (quoting Lee v. Commonwealth, 18 Va. App. 235, 239, 443 S.E.2d 180, 182 (1994)).

Here, the officer, while responding to a call for "shots-fired," saw Calloway, whom he knew to have a history with firearms, sitting in the passenger seat of a white vehicle that was being driven, at what he thought was a "high rate of speed," away from the location of the "shots-fired" report.  The officer believed the white vehicle, as it made a wide turn from the street where the report of "shots-fired" originated, would have struck his car had he been closer.  Officer Gagnon knew Calloway was in a car that was hastily leaving the area where a "shots-fired" call had just occurred.  Notably, Officer Gagnon had more information than did the officer in Davis.  Specifically, Officer Gagnon had numerous prior dealings with Calloway, most involving firearms, and testified that throughout his career he knew Calloway to possess or be around firearms.  Officer Gagnon also observed Calloway bending forward in the white vehicle as it passed his police car.

Based on the call for "shots-fired" in the area, the officer's knowledge of Calloway's history with guns, Calloway's bending movements while he passed the officer, and the way in which the car turned the corner, Officer Gagnon had reasonable, articulable suspicion to detain

Calloway to maintain the status quo momentarily while obtaining more information as to whether he had any involvement in the activity that led to the "shots-fired" call. Upon stopping the car, the driver allowed the officer to search the car. During that search, Officer Gagnon found a gun under Calloway's seat. He then learned that Calloway had previous felony convictions. Therefore, the trial court erred in granting Calloway's motion to suppress. Accordingly, we reverse the trial court's ruling and remand for further proceedings.[4]

<u>Reversed and remanded.</u>

---

[4] Because we find that the trial court erred in granting Calloway's motion to suppress, we need not consider the Commonwealth's argument that the exclusionary rule does not apply here.